UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Christopher Larkett,

       Plaintiff,

v.

William Jones, Daniel Kuchuk, Julie Darby,
Brandi Branson-Boone, Larry Steckelberg,
and State of Michigan,

       Defendants.

_____/

Case No. 14-12723

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [20]**

This matter comes before the Court on Defendants' motion for summary judgment.
Plaintiff was a limited term employee in the Michigan Department of Treasury for 90 days
before he was terminated. He alleges that his termination violated the anti-discrimination
and anti-retaliation provisions of Title VII, 42 U.S.C. § 2000e *et seq.*, and Michigan's Elliot-
Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.* Defendants argue
that Plaintiff was terminated for poor performance. For the reasons stated below,
Defendants' motion is GRANTED IN PART and DENIED IN PART.

**I.    Facts**

Plaintiff was hired as a limited-term employee in the Department of Treasury's
Michigan Business Tax (MBT) unit on July 9, 2012. His job involved responding to written
correspondence from taxpayers with questions about the MBT. These limited term positions
lasted only 12 months but could be extended beyond that time. They were created in an

effort to reduce a backlog of 13,000 to 14,000 pieces of correspondence that required responses.

During his employment, Plaintiff worked under Supervisor (and Defendant) Bill Jones in a group with six other employees: Elizabeth Burton, Angelica Hudson, James Ryan, Bethany Sherman, Jedidiah Wiedland, and Megan Moose. A second group of employees was supervised by Eldiva Thomas. Bill Jones and Eldiva Thomas were in turn supervised by Defendant Brandi Branson-Boone. Defendant Daniel Kuchak assisted Bill Jones as a departmental technician. He reviewed the work of limited term employees, and also created a spreadsheet detailing the number of times a limited term employee had work rejected by a supervisor (i.e., the rejection rates of the limited term employees). (Pl.'s Resp., Ex. O.) Defendant Julie Darby worked in Human Resources as the Labor Relations Officer.

According to Defendants, Plaintiff performed poorly throughout his employment. The first weeks of Plaintiff's position consisted of training on how to process returns. The training was led by Daniel Kuchuk and Kelly Darling. At the end of the training period, the group was asked whether any of them felt that they were ready to begin work or whether they felt that they needed additional training. Plaintiff, and a few other employees, indicated that they were ready to work. The rest continued training. Although Plaintiff stated that he was ready to work, his work compared negatively to his peers. Kuchak testified that Plaintiff's written work was "poorly done." (Defs.' Mot., Ex. C at 140:4-6.) It contained frequent spelling errors, typos, incorrect dates, and incorrect tax information. (*Id.* at 140:7-9; 142:22-143:7.) These errors were more frequent than the other limited term employees. (*Id.* 140:16-141:3; 144:3-9.) This would result in Plaintiff's work having to be returned back to him. (*Id.* at 141:4-12.) Sometimes drafts of Plaintiff's work would contain errors that had

2

been pointed out in earlier drafts. (*Id.* at 141:22-24.) Kuchak also testified that, unlike other employees, Plaintiff would respond defensively when his errors were pointed out to him and would not accept responsibility. (*Id.* at 145:24-147:15.)

Plaintiff acknowledged that his work contained errors and that he would sometimes see the same issue more than once. (*Id.*, Ex. B at 66:23-67:6; 69:16-25.) He also testified that Bill Jones told him to focus on the quality rather than the quantity of his work. (*Id.* at 76:21-22:3.) The record contains emails from one occasion where Plaintiff's work was rejected from three separate accounts. (*Id.*, Ex. D.) Bill Jones asked Plaintiff to start over completely. (*Id.*) Following this, Plaintiff wrote an email to Brandi Branson-Boone stating that he felt he was being harassed and that "no one else is being treated this way." (*Id.*) On another occasion, Plaintiff brought a binder of human resources information to a meeting when he had been asked to bring his training manual. (*Id.*, Ex. F at 146:16-147:16.) Although Bill Jones found this to be significant because it showed that Plaintiff did not know where his training manual was, (*Id.* at 147:11-16), Plaintiff testified that the binders all looked the same and he accidently grabbed the wrong one. (Pl.'s Resp., Ex. B at 206:7-16.)

Defendants also state that Plaintiff had difficulty interacting with others in the office. For example, a co-worker, and member of Plaintiff's office van pool, emailed Plaintiff that she would report him for harassment after he referenced her in an email to another co-worker. (Defs.' Mot., Ex. G.) Another time, Plaintiff was involved in an argument with Supervisor Eldiva Thomas over how the computers in the office should be turned off at the end of the day.

Although Plaintiff acknowledges that his work contained errors, he believes that his work was unfairly scrutinized compared to his peers. (Pl.'s Resp., Ex. B at 211:6-15.) This

3

view is partly based on three conversations he held with Brandi Branson-Boone. The first conversation occurred around July 30, 2012. When Plaintiff was in the office kitchen cleaning his coffee mug, Plaintiff states that Branson-Boone approached him and said: "Make sure that you cross all your T's and dot all of your I's . . . . They're watching you. They don't like you . . . but you have nothing to worry about. They can't do anything without going through me." (Pl.'s Resp., Ex. B at 42:1-7.) Plaintiff testified that he understood that Branson-Boone was referring to Plaintiff's race. (*Id.* at 208:8-21.) The second conversation occurred on August 23, 2012. Branson-Boone told Plaintiff: "You're not liked, you're dark skinned. You have Dreadlocks and the culture is not friendly here for blacks." (*Id.* at 51:3-7.) Plaintiff also testified that Branson-Boone told him that she did not approve of interracial relationships. Specifically, she disliked his interactions with a white employee, Billie Joe Clay. (*Id.* at 64:16-65:22; 213:13-214:5.) Branson-Boone denied that she felt this way. (Defs.' Mot., Ex. J at 89:8-24.)

Finally, on September 13, 2012, Plaintiff had a conversation with Branson-Boone on racism in their workplace. (Pl.'s Resp., Ex. B at 52:10-53:53:16.) Branson-Boone again told Plaintiff that the other supervisors could not do anything to him without going through her. She also told him not to approach Bill Jones regarding the issue. This conversation was preceded by an email from Plaintiff to Branson-Boone concerning the time Bill Jones made him redo his work on three accounts. In that email, Plaintiff wrote that his experience had confirmed statements he heard prior to his employment on how "select groups of people" were treated when working for the State of Michigan. (Defs.' Mot., Ex. D.)

In addition to these conversations with Branson-Boone, Plaintiff highlights the differences between how he was treated and how white employees were treated at the

4

Department. For example, Plaintiff testified that he witnessed a white employee tell his departmental technician that he had submitted an incorrect return and to "get ready" because she was going to receive "thirty more just like it." (Pl.'s Resp., Ex. B at 125:1-12.) Plaintiff informed Brandi Branson-Boone of this event, but she did not see any reason to investigate it. (*Id.*, Ex. F at 71:11-15.)

Plaintiff also focuses on performance spreadsheets prepared by Daniel Kuchak. (Pl.'s Resp., Ex. O.) These spreadsheets, starting on October 6, 2012, show the rejection rates of the employees who worked under Bill Jones. Plaintiff compares his rejection rates with those of James Ryan, a white employee in his group. For the final two weeks of Plaintiff's employment, Plaintiff submitted 35 returns with 23 rejections (66% rejection rate), while James Ryan submitted 14 returns with 10 rejections (71% rejection rate). Furthermore, in the time period after Plaintiff's termination, James Ryan consistently had a rejection rate higher than his peers. Rejections were based on a "point of error" review, where a single "true error" theoretically could result in a rejection. (*Id.*, Ex. E at 167:3-12.) However, there were no policies or procedures in place to determine when a rejection would be made. (*Id.* at 167:21-24.)  Brandi Branson-Boone testified that she would typically not reject a return for a single error, but she could not speak for other supervisors. (*Id.*, Ex. F at 46:7-17.)

After only two months of employment, Defendants decided to terminate Plaintiff. On September 17, 2012, at 8:54 AM, Brandi Branson-Boone sent Larry Steckelberg,[1] her supervisor, an email stating: "Ok forget our conversation about Chris. I am ok to get rid of him." (Defs.' Mot., Ex. I.) One hour later, Steckelberg sent an email to Julie Darby, stating

---

[1] Larry Steckelberg was originally named as a defendant in this case but was dismissed by stipulation on May 26, 2015. (Dkt. 19.)

in part: "I think we are in a position that we need to terminate one of our limited term employees . . . He is notable for his poor performance and an increasing belligerence with the techs and supervisors . . . . [I]t appears this is not a good fit." (*Id.*, Ex. M.) Steckelberg then asked who to work with in Human Resources to "move forward on the termination." (*Id.*)

When Branson-Boone emailed Steckelberg that she was "ok to get rid of" Plaintiff, she accidentally cc'd Plaintiff on the email. (*Id.*, Ex. I; Ex. J at 30:12-31:9.) On September 20, 2012, Plaintiff sent a series of emails to Darby regarding perceived racial discrimination in the workplace. (*Id.*, Exs. D, E, L.) One states: "I was reading over my New Hire Manual and it clearly states basically that Harassment and Retaliation are basically not tolerated. And that is clearly what I have been a victim of. It does mention Discrimination- And I am a Black Male and the only one in my group experiencing these issues." (*Id.*, Ex. L.) The others relayed Plaintiff's past emails to Branson-Boone on the issues he had been having in the workplace. Aside from these emails, Plaintiff did not fill out a formal complaint form. Darby did not investigate Plaintiff's claims of discrimination or refer them to Michael Davis, the Human Resources Director.

The next day, Darby sent an email to Michael Davis asking for his approval to dismiss Plaintiff. (Pl.'s Resp., Ex. L.) Darby did not have the authority to dismiss Plaintiff herself. Davis approved, and Darby then sent another email to Steckelberg and Branson-Boone stating that Davis had given his approval to "issue Christopher an unsat probationary rating and dismiss him." (*Id.*, Ex. M.) She also asked that Bill Jones prepare Plaintiff's performance rating as "[t]his is the document that will support the dismissal." (*Id.*) All limited term employees received a 90 day performance review. Despite this email, Bill Jones

6

testified that he prepared Plaintiff's review just as he would have prepared any other limited term employee's. (*Id.*, Ex. D at 102:22-103:2.) Further emails show that Darby, Branson-Boone, and Jones prepared Plaintiff's performance review together. (*Id.*, Ex. N.) On October 17, 2012, Plaintiff was given an unsatisfactory performance evaluation and was terminated. (Defs.' Mot., Exs. O, P.) The review states that Plaintiff's performance was "unsatisfactory" at all levels. (*Id.*, Ex. O.)

Plaintiff filed a claim for discrimination with the EEOC on February 13, 2013. (*Id.*, Ex. R.) The EEOC issued a Right-to-Sue Letter on April 24, 2014. (*Id.*, Ex. S.) Plaintiff filed this lawsuit alleging discrimination and retaliation under Title VII and ELCRA on July 11, 2014.

## II.   Standard of Review

Summary judgment is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III.   Analysis

Plaintiff's complaint alleges both discrimination and retaliation under Title VII and ELCRA. "Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir.

7

2004). This includes retaliation cases as well. *Wasek v. Arrow Energy Servs.*, Inc., 682 F.3d 463, 472 (6th Cir. 2012) (stating that for retaliation claims, "the ELCRA analysis is identical to the Title VII analysis"); see also *Beard v. AAA of Michigan*, 593 F. App'x 447, 452 (6th Cir. 2014) (holding that the Title VII but-for causation standard was appropriately applied to an ELCRA retaliation claim). The Court accordingly applies the same analysis to Plaintiff's claims. *See Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673-77 (6th Cir. 2013) (applying single analysis to claims under Title VII and ELCRA).

### A. Plaintiff's Discrimination Claims

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1). A plaintiff can prove discrimination through either direct or circumstantial evidence. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). Although both parties present this case as one involving circumstantial evidence only, the Court finds that Plaintiff has presented direct evidence of discrimination sufficient to overcome a motion for summary judgment. "Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

8

Plaintiff testified that Brandi Branson-Boone told him, "cross all your T's and dot all of your I's . . . . They're watching you. They don't like you," (Pl.'s Resp., Ex. B at 42:1-7), and, "you're not liked, you're dark skinned. You have dreadlocks and the culture is not friendly here for blacks." (*Id.* at 51:3-7.) These statements do not require any inferences to conclude that unlawful discrimination was at least a motivating factor in the decision to terminate Plaintiff. "Where a plaintiff presents direct evidence of discriminatory intent in connection with a challenged employment action, 'the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination.' " *Johnson*, 319 F.3d at 865 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000)). Because Defendants have argued this case only on circumstantial evidence grounds, they have not made any arguments relating to this burden nor have the shown that no reasonable jury could find in Plaintiff's favor.

Even if Branson-Boone's statements are not direct evidence of discrimination, Plaintiff can still prove discrimination through circumstantial evidence. To prove discrimination using circumstantial evidence, Plaintiff must use the *McDonnell Douglas* burden shifting framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Plaintiff first bears the burden of establishing a prima facie case of discrimination. This requires Plaintiff to demonstrate that: (1) he is the member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class of treated differently than similarly situated non-protected employees. *Id.* at 391. This burden is "not onerous." *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If Plaintiff establishes a prima facie

9

case, the burden shifts to Defendants to produce a "legitimate, non-discriminatory reason" for the action taken. *Id.* If Defendants produce such a reason, the burden shifts back to Plaintiff to show that Defendants' "proffered reason was not its true reason, but merely a pretext for discrimination." *Id.* at 391-92.

Defendants concedes that Plaintiff is a member of a protected class and that he suffered an adverse employment action—his termination. Defendants argue that Plaintiff cannot establish the second or fourth prongs of his prima facie case. First, Defendants argue that Plaintiff cannot show that he was qualified for his job. To prove that he was qualified, Plaintiff must "demonstrate that [he] was meeting [his] employer's legitimate expectations and was performing to [his] employer's satisfaction." *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 729 (6th Cir. 1999) (citing *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991)). However, "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating [the] plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000). In other words, "a court may not consider the employer's alleged nondiscriminatory reason for taken as adverse employment action when considering the prima facie case." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc). Here, Defendants' sole argument that Plaintiff was not qualified is that he could not satisfactorily perform his position. (Defs.' Mot. at 14-15.) That, however, is the same nondiscriminatory reason produced by Defendants as their reason for terminating Plaintiff. (*Id.* at 16-19.) Per *Cline* and *Wexler*, the Court cannot consider this evidence at the prima facie stage of the burden shifting framework. 296 F.3d at 660; 317

10

F.3d at 574. Instead, the Court "should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler*, 317 F.3d at 575. This includes "criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* Without considering Plaintiff's alleged poor performance, there is at least a genuine issue of fact as to whether Plaintiff was objectively qualified for his position.

Second, Defendants argue that Plaintiff cannot show that he was treated differently than a similarly situated non-protected employee. "To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar in all of the *relevant* aspects." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (internal quotations omitted).

> While the precise aspects of employment that are relevant to determining whether the similarly situated requirement has been satisfied depend on the facts and circumstances of each case, this court has generally focused on whether the plaintiff and the comparable employee: (1) share the same supervisor; (2) are subject to the same standards; and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 480-81 (6th Cir. 2008) (internal quotations omitted). Plaintiff states that he was treated differently than James Ryan. Ryan was a white employee who was hired at the same time as Plaintiff and to the same position, and who also worked in Plaintiff's group under the same supervisor. Plaintiff has provided evidence in the form of spreadsheets that, like Plaintiff, Ryan also performed poorly compared to other members of his group. (Pl.'s Resp., Ex. O.) Ryan, however, was not terminated after only 90 days, but was instead kept on until his limited one-year term was

11

complete. Ryan also received a relatively satisfactory performance review. (*Id.*, Ex. Q.) This is sufficient to create a genuine issue of fact that Plaintiff was treated differently than a similarly situated non-protected employee.

Because Plaintiff has established a prima facie case of discrimination, the burden shifts to Defendants to produce a legitimate, non-discriminatory reason for Plaintiff's termination. Defendants have provided evidence that Plaintiff was terminated for poor performance. Plaintiff's 90 day performance review states that his work was unsatisfactory at all levels including job knowledge, communication, and decision making. Plaintiff acknowledged that his written work contained errors. Daniel Kuchak also testified at length about Plaintiff's poor performance. Defendants have met their burden of producing a legitimate, non-discriminatory reason for Plaintiff's termination.

Plaintiff accordingly must show that Defendants' proffered reason was merely a pretext for discrimination. Plaintiff can do so by showing that the justification: (1) had no basis in fact; (2) did not actually motivate Defendants' action; or (3) was insufficient to motivate Defendants' action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). Despite these separate considerations, "at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). In the summary judgment context, this requires Plaintiff to "produce[] evidence from which a jury could reasonably doubt the employer's explanation." *Id.*

Plaintiff argues that he can show pretext based on James Ryan's performance and Brandi Branson-Boone's statements concerning discrimination. The Court agrees. There is evidence that James Ryan had similar rejection rates to Plaintiff yet was allowed to

12

complete his limited term. *See Hollins v. Atl. Co.*, 188 F.3d 652, 661 (6th Cir. 1999) (holding that evidence that non-protected employees were terminated for engaging in substantially identical conduct that motivated protected employee's discharge could establish pretext). Although Defendants repeatedly refer to the fact that Plaintiff admitted that his work contained errors, the spreadsheets show that all of the limited term employees' work contained errors. Furthermore, the "point of error" review method used by Defendants was subjective and could vary between supervisors. *See Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 461 (6th Cir. 2004) ("[S]ubjective reasons provide 'ready mechanisms for discrimination.' ") (quoting *Grano v. Dep't of Dev. of City of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983)).

The Court also hesitates to find a lack of pretext given Plaintiff's testimony that Brandi Branson-Boone told him, "cross all your T's and dot all of your I's . . . . They're watching you. They don't like you," (Pl.'s Resp., Ex. B at 42:1-7), and "you're not liked, you're dark skinned. You have dreadlocks and the culture is not friendly here for blacks." (*Id.* at 51:3-7.) Although there is considerable evidence that Plaintiff performed poorly, this testimony provides support for his theory that he was unfairly scrutinized compared to his peers because of his race. Accordingly, the Court declines to grant summary judgment on Plaintiff's discrimination claims.

### B. Plaintiff's Retaliation Claims

In addition to prohibiting unlawful discrimination, Title VII also prohibits an employer from retaliating against any of its employees for opposing its discriminatory practices. 42 U.S.C. § 2000e–3(a). Like claims of discrimination, Plaintiffs alleging retaliation under Title VII can do so with either direct evidence or circumstantial evidence. *Laster v. City of*

13

*Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Plaintiff seeks to prove his claim using circumstantial evidence of retaliation. These claims are analyzed under the *McDonnell Douglas* burden shifting framework. *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

Under this framework, Plaintiff must first establish a prima facie case of retaliation. This requires Plaintiff to show that: (1) he engaged in a protected activity; (2) Defendants knew of his protected activity; (3) Defendants thereafter took an adverse employment action against him; and (4) there is a causal connection between the protected activity and the adverse employment action. *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 502 (6th Cir. 2009). If Plaintiff succeeds in establishing his prima facie case, a presumption of unlawful retaliation arises, and the burden shifts to Defendants to produce a legitimate, non-retaliatory reason for its action. *Id.* If Defendants produce such a reason, the burden then shifts back to Plaintiff to show that Defendants' proffered was mere pretext. *Id.*

Plaintiff's retaliation claim is based on the September 20, 2012 emails he sent to Julie Darby alleging discrimination and harassment based on race. (Pl.'s Resp., Ex. K; Ex. B at 56:22-57:4.) Defendants do not contest that these emails were protected activity or that Plaintiff's termination was an adverse employment action. Instead, Defendants argue that Plaintiff cannot establish a casual connection between the emails and his termination because the termination process had already begun by the time the emails had been sent. The Court agrees. To establish causation, Plaintiff must show that the emails were "a but-for cause of the adverse action." *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 582 (6th Cir. 2014) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534-35 (2013)). Plaintiff cannot do so. Plaintiff's emails were sent on September 20th. Defendants,

however, had already decided to terminate him by that time as evidenced by Brandi Branson-Boones' September 17th email to Larry Steckelberg (and accidentally cc'd to Plaintiff) that she was "ok to get rid of [Plaintiff]," (Defs.' Mot., Ex. I), and Steckelberg's September 17th email to Julie Darby that they were "in a position that we need to terminate" Plaintiff. (*Id.*, Ex. M.) Plaintiff has not presented evidence sufficient to create a genuine dispute of material fact that his September 20th emails were a but-for cause of his termination because they were written after the decision to terminate him had already been made. Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claims.

### C. Liability of Individual Defendants

Defendants argue that Daniel Kuchak and Julie Darby must be dismissed because they did not take any adverse employment actions against Plaintiff. The Court agrees. Kuchak and Darby are only listed as Defendants in the ELCRA counts of the complaint. Under ELCRA (though not Title VII), "agents" of an employer can be held individually liable as "employers." *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 861 (Mich. 2005). " 'Agents' are persons to whom the employing agency delegates supervisory power and authority over subordinates. *Elezovic v. Bennett*, 731 N.W.2d 452, 461 (Mich. Ct. App. 2007). They have "influence and power over their victim that coemployees do not enjoy, such as control over their victim's employment circumstances and opportunities like promotions, bonuses, overtime options, raises, shift and job assignments, and terminations." *Id.* at 459. The parties have not briefed whether Kuchak or Darby qualify as "agents." Nevertheless, even if they are "agents," the Court agrees that they must be dismissed.

15

To be liable under ELCRA, the "employer" must have taken a materially adverse employment action against the employee. *Chen v. Wayne State Univ.*, 771 N.W.2d 820, 839 (Mich. Ct. App. 2009) ("[I]n order to be actionable, an employment action must be materially adverse to the employee—that is, it must be more than a mere inconvenience or minor alteration of job responsibilities."). "Materially adverse employment actions are akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (internal quotations omitted). There is no doubt that Plaintiff's termination was a materially adverse employment action. But neither Kuchak or Darby terminated Plaintiff. Kuchak reviewed Plaintiff's work and issued rejections on individual assignments. That is not a materially adverse action. Darby recommended Plaintiff's termination to Michael Davis, but she was not the ultimate decision maker. The recommendation, standing alone, was also not a materially adverse employment action. *See Plautz v. Potter*, 156 F. App'x 812, 817 (6th Cir. 2005) ("[I]t is settled in this circuit that a threat to discharge is not an adverse employment action") (citing *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999)).

Plaintiff argues that Darby can be found liable on a "cat's paw" theory. "This theory involves circumstances where a seemingly unbiased decisionmaker makes an adverse employment decision that was in part motivated by a biased subordinate." *Davis v. Omni-Care, Inc.*, 482 F. App'x 102, 109 (6th Cir. 2012); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) ("[I]f a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is

16

liable under the [Act]."). According to Plaintiff, Darby may be liable under this theory because she relied on Bill Jones' evaluations of Plaintiff's performance in making the recommendation to terminate him. But cat's paw liability does not change the requirement that the "employer" being held liable must have taken a materially adverse employment action against the employee alleging discrimination. Even under a cat's paw theory, Darby did not herself take a materially adverse employment action against Plaintiff. Both Kuchak and Darby are dismissed.

This same reasoning also applies to the other individual Defendants in this case: Brandi Branson-Boone and Bill Jones. Although they played a role in Plaintiff's termination, neither was the one who actually terminated him. Plaintiff cannot show that either took a materially adverse employment action against him. Accordingly, Branson-Boone and Jones are dismissed as well.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART. Plaintiff's retaliation claims (Counts II and IV) are DISMISSED. Defendants Bill Jones, Brandi Branson-Boone, Daniel Kuchak, and Julie Darby are DISMISSED.

SO ORDERED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: August 14, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 14, 2015, by electronic and/or ordinary mail.

s/Carol J. Bethel

17

Case Manager